04-1670-CBS

## AFFIDAVIT OF MARK S. KARANGEKIS

I, Mark S. Karangekis, being duly sworn, depose and state as follows:

1.  I am a Special Agent with the Federal Bureau of Investigation ("FBI").  I am currently assigned to the Violent Crime Task Force ("VCTF").

2.  I have been employed by the FBI for more than ten years. During that time, I have been involved in numerous investigations relating to a wide variety of suspected criminal activity including drug and firearms trafficking by organized street gangs.  I have been the affiant on numerous affidavits in support of criminal complaints and other applications and have spent much of the last four years investigating gangs and gang-related activity in and around the city of Lawrence.  I have received training in the field of narcotics enforcement and investigations including, but not limited to, training regarding the identification of common street drugs such as cocaine base, a/k/a "crack cocaine."  Through my training, education, and experience, I have also become familiar with the manner in which illegal drugs are transported, stored, and distributed, and with the methods of payment for such drugs.

3.  I am submitting this affidavit in support of an application for a criminal complaint charging **JOSE CARRASQUILLO**, **A/K/A "SANDY,"**  with two counts of possession of cocaine base, a/k/a "crack cocaine," with intent to distribute and distribution

of crack cocaine in violation of 21 U.S.C. §841 (a)(1).  As is
explained more fully below, **CARRASQUILLO** made controlled sales of
crack cocaine to a cooperating witness "the CW") on October 8,
2003 and twice on October 10, 2003.   All of these sales and some
of the conversations leading up to them were consensually
recorded by the CW, who has known **CARRASQUILLO** for years and who
identified him from a photo array as the seller of the drugs.
Tapes of these conversations and meetings have also been reviewed
by Detective Richard Brooks of the Lawrence Police Department who
speaks Spanish and is familiar with **CARRASQUILLO**'s voice.
Detective Brooks has confirmed that the voice of the individual
with the CW during the buys belongs to **CARRASQUILLO**.

    3.   This affidavit is submitted for the limited purpose of
establishing probable cause to believe that **CARRASQUILLO** has
committed the above-described offenses.  Accordingly, I have not
included each and every fact known to myself and other law
enforcement officers involved in this investigation.

    4.   For the past eighteen months, I have been the case agent
on a multi-agency investigation of the Latin Kings, a violent
street gang that operates various local chapters in Massachusetts
including, but not limited to, Lawrence and Lowell.  Over the
course of this investigation, law enforcement agents have made
numerous purchases of controlled substances from members or
associates of the Lawrence and Lowell chapters of the Latin Kings
using various confidential informants and cooperating witnesses.

All of the buys and many of the conversations leading up to these purchases have been consensually recorded on audio and/or videotape. All of the drugs purchased have been field tested or certified by the DEA's Northeast Regional Laboratory ("NERL").

5. The current investigation into the crack cocaine trafficking of **CARRASQUILLO** was initiated in October, 2003 when the CW identified **CARRASQUILLO** as someone from whom the CW could purchase crack cocaine.[1] He/she reported to me that **CARRASQUILLO** sells drugs to and with members of the Latin Kings (including his brothers, EDWIN SERRANO, A/K/A "KING PSYCHO," and LUIS RAMIREZ, A/K/A "KING LITTLE PSYCHO,") and other street gangs operating in the Greater Lawrence Area.[2]

6. I have investigated **CARRASQUILLO**'s background and criminal history and it corroborates what the CW told me. For example, I learned that, in January, 2002, **CARRASQUILLO** made a sale of crack cocaine to a DEA undercover agent. That sale led

---

[1] The CW is a former member of the Latin Kings who has known **CARRASQUILLO** for years. The CW has a substantial criminal record and history of drug trafficking and gang activity. The CW became involved in this investigation after he/she sold drugs to another cooperating witness. The CW has not been charged with this offense and has also been provided with assistance on a state probation matter that facilitated his/her ability to assist the FBI in this investigation. The CW has made drug purchases from other targets in this investigation. Information he/she has provided me has repeatedly been corroborated by the events of individual transactions and by information provided by other confidential informants and cooperating witnesses.

[2] SERRANO and RAMIREZ have both been indicted for drug offenses as part of this investigation.

to the issuance of a state search warrant for **CARRASQUILLO**'s residence. The execution of that warrant resulted in the seizure of additional crack cocaine. **CARRASQUILLO** was thereafter charged with drug offenses in Lawrence District Court, convicted, and sentenced to six months in prison.

7. **CARRASQUILLO** was incarcerated at the Essex County House of Correction in Middleton in connection with these offenses. While **CARRASQUILLO** was in jail, members of the Essex County Sheriff's Department monitored his telephone calls due to his connection to the Latin Kings. The calls that were monitored included calls that **CARRASQUILLO** made to his brother, EDWIN SERRANO, in which ongoing drug activities were discussed. Those calls have been reviewed by Detective Brooks, who has confirmed that some of those calls were drug related and also became familiar with **CARRASQUILLO**'s voice.

8. After **CARRASQUILLO** was released from the Essex County House of Correction, a car **CARRASQUILLO** was driving was stopped by the Massachusetts State Police. After smelling marijuana coming from inside the car, the officers searched it and seized approximately 100 grams of crack cocaine. In October, 2002, **CARRASQUILLO** was charged with drug offenses arising out of this incident in Westborough District Court and was later indicted in Worcester Superior Court. That case remains pending and **CARRISQUILLO** remains on pretrial release in connection with it.

9. In January, 2003, **CARRASQUILLO** sold more crack cocaine

to a cooperating witness working with the Bureau of Alcohol, Firearms, and Tobacco ("ATF"). I understand that the sale occurred after **CARRASQUILLO** negotiated to sell the cooperating witness two guns. When the cooperating witness showed up at **CARRASQUILLO**'s apartment, **CARRASQUILLO** said he didn't have the guns and sold the cooperating witness crack cocaine instead.

### A. THE PURCHASE OF CRACK COCAINE FROM CARRASQUILLO ON OCTOBER 3, 2003

10. The first purchase of crack cocaine charged in this complaint occurred on October 3, 2003. At approximately 6:10 p.m. that evening, I met with the CW and asked him/her to place a telephone call to **CARRASQUILLO**. I recorded the telephone call with the CW's consent. Detective Brooks (who, as set forth above, speaks Spanish and is familiar with **CARRASQUILLO**'s voice) was also present and listened to the call as it occurred.

11. The CW asked **CARRASQUILLO** for 14 grams of crack in Spanish. **CARRASQUILLO** agreed to sell the drugs to the CW and told the CW to come to his apartment located at 36 Winter Street in Lawrence.

12. In anticipation of the meeting with **CARRASQUILLO**, I searched the CW and the car that he/she would be driving to ensure that the CW had no controlled substances or cash on him/her. I then gave the CW a recording device, a transmitter, $500 in official government funds ("OGC") and a car equipped with audio/video surveillance equipment and told the CW to go to

Winter Street (where surveillance agents had already gone) to meet **CARRASQUILLO**.  The CW was then followed as he/she drove to 36 Winter Street.

13.  The CW got to 36 Winter Street at approximately 6:35 p.m.  I watched the CW go into 36 Winter Street through the side entrance and listened to him/her climbing stairs.  The CW knocked on a door and was heard entering a room and having a conversation with an individual whom Detective Brooks (who was also monitoring the transmitter) recognized to be **CARRASQUILLO**. The CW gave **CARRASQUILLO** $500 and waited in the living room while **CARRASQUILLO** went into another room.  **CARRASQUILLO** returned moments later and gave the CW 35 individual packets containing a beige rocky substance.  In the course of this transaction, **CARRASQUILLO** also showed the CW a large wad of cash.

13.  The CW then left 36 Winter Street.  Agents watched the CW return to his/her car and followed him/her back to a prearranged meeting location where I debriefed him/her (obtaining the information summarized above) and he/she provided me with the recording equipment and the packets that **CARRASQUILLO** had given him/her.  I field tested the packets (the contents field tested positive for cocaine) and inspected them.  Based on the color, odor and appearance of the material in the packets, I believe that it was crack cocaine.

14.  The packets purchased from **CARRASQUILLO** on October 3, 2003 were thereafter sent to the NERL.  On November 4, 2003, NERL

certified that the packages contained 4.1 grams of cocaine base.

**B. THE PURCHASES OF CRACK COCAINE FROM CARRASQUILLO ON OCTOBER 10, 2003**

15. I also met with the CW on October 10, 2003. The purpose of this meeting was to attempt to purchase more crack cocaine from **CARRASQUILLO**.

16. The CW called **CARRASQUILLO** at approximately 7:20p.m. that evening.[3] The CW requested crack cocaine from **CARRASQUILLO**. **CARRASQUILLO** agreed to sell it and told the CW to come to his apartment.

18. After this call was finished, I followed the same procedures already described for the October 3 transaction to prepare the CW. The CW was searched, given recording equipment, a transmitter, and $500 in OGC, and then followed as he/she drove to 36 Winter Street and went inside the building at approximately 7:45p.m.

19. Over the transmitter, we heard the CW go into an apartment and speak about drugs to an individual whom Detective Brooks (who again monitored the transmitter) recognized to be **CARRASQUILLO**. In fact, the CW later told me that, when he/she entered **CARRASQUILLO**'s apartment, **CARRASQUILLO** and two other men were in the kitchen breaking up crack cocaine and bagging it for resale. The CW handed **CARRASQUILLO** $500 and he broke off a piece

---

[3] As with the October 3 transaction, the call was recorded and monitored by Detective Brooks, who recognized the voice on the other end of the line as **CARRASQUILLO**'s.

of crack cocaine, put it inside a plastic bag, and gave it to the CW.

20.    The CW left 36 Winter Street shortly before 8p.m. He/she was followed back to a meeting location, searched again, and provided me with the recording equipment and the package that CARRASQUILLO had given him/her.  I inspected and field tested th contents of the package (which tested positive for cocaine), and determined that the contents were crack cocaine.

21.    I received a telephone call from the CW approximately 30 minutes later.  He/she advised me that CARRASQUILLO had called to offer her/him 7 more grams of crack cocaine and 15 "20" bags for $500 and that he said he was in "a hurry."[4]  I told the CW to return to the meeting location so that we could make this second purchase.

22.    I met the CW for a second time at about 9:15p.m. He/she was given $500 more OGC, recording equipment and a transmitter, and followed as he/she returned to 36 Winter Street. As the CW drove over, he/she got another telephone call from CARRASQUILLO telling him/her to hurry up.

23.    We watched the CW go back inside and listened to him/her speak to CARRASQUILLO after going back inside the building.  The CW told me that he/she went inside the apartment, and gave CARRASQUILLO the OGC in exchange for four plastic bags

---

[4] Based on my training and experience, I know that a "20 bag" refers to an amount of crack cocaine sold on the street for $20.

of crack cocaine.   Detective Brooks confirmed to me that the person we heard speaking to the CW over transmitter was **CARRASQUILLO**.

24.   After the second deal was completed, we followed the CW back to our meeting location, where I searched the CW and got the recording equipment and four plastic bags from him/her.   The contents of the bags field tested positive for cocaine and had the color, texture and appearance of crack cocaine.

25.   The two drug exhibits purchased from **CARRASQUILLO** on October 10, 2003 were also sent to the DEA NERL.   On November 20, 2003, NERL certified that they contained 3.9 and 5.4 grams of cocaine base respectively.

26.   Based on the forgoing, I believe there is probable cause to believe that, on October 3, 2003 and on two occasions on October 10, 2003,   **JOSE CARRASQUILLO, A/K/A "SANDY"**, did possess with intent to distribute and distribute cocaine base, a/k/a "crack cocaine" in violation of Title 21, United States Code, Section 841 (a)(1).

Signed under the pains and penalties of perjury this _____ Day of February, 2004.

_____
MARK S. KARANGEKIS
Special Agent, FBI

Sworn to and subscribed before me this ___ day of February, 2004

_____
MAGISTRATE JUDGE CHARLES B. SWARTWOOD III